Howard L. Horwitz (SBN 105858)
*hhorwitz@kandhlaw.net*
Selina Hartonians (SBN 285101)
*shartonians@kandhlaw.net*
KIBRE & HORWITZ LLP
9100 Wilshire Boulevard, Suite 655E
Beverly Hills, CA  90212
Tel:    (310) 557-1213
Fax:    (310) 278-1033

Attorneys for Cross-Claimants TING-TAR WU
and ALEXANDER TSAY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association,<br><br>    Plaintiff,<br><br>v.<br><br>AEJ ASSOCIATES, LLC, a New Jersey limited liability company; TING-TAR WU, also known as STEVEN WU, an individual; CHIA JUNG WU, also known as JESSICA WU, an individual, erroneously sued as CHIA JING WU, also known as CATHERINE WU; LIHUI LO, also known as KITTY LO, an individual; ALEXANDER TSAY, an individual,<br><br>    Defendants.<br><br>―――――――――――<br>TING-TAR WU, also known as STEVEN WU, an individual; and ALEXANDER TSAY, an individual,<br><br>    Cross-Claimants,<br><br>v.<br><br>LIHUI LO, also known as KITTY LO, an individual,<br><br>    Cross-Defendant. | CASE NO.: 2:15-cv-09258-SJO-E<br><br>Hon. S. James Otero<br><br>**CROSS-CLAIMANTS TING-TAR WU AND ALEXANDER TSAY'S AMENDED CROSS-CLAIM** |

1

Cross-Claimants Ting-Tar Wu, also known as Steven Wu, and Alexander Tsay (collectively "Cross-Claimants") hereby allege the following on information and belief:

### THE PARTIES

1.      Cross-Claimant Ting-Tar Wu ("Mr. Wu") was at all material times an individual residing in Orange County, California.

2.      Cross-Claimant Alexander Tsay ("Mr. Tsay") is, and at all material times was, an individual residing in New Jersey.

3.      Cross-Defendant Lihui Lo ("Cross-Defendant") is, and at all material times was, an individual residing in Orange County, California. From January 18, 2013 through July 17, 2015, Mr. Wu reasonably believed he was legally married to Cross-Defendant and, as a result, was her putative spouse.

### JURISDICTION AND VENUE

4.      This court has ancillary jurisdiction over this cross-claim because this cross-claim relates to the Subject Funds in the amount of $354,979.49 that are the subject matter of the Complaint herein.

5.      Venue is proper in this district because Cross-Defendant resides within the Central District of California. *See* 28 U.S.C. § 1397.

### GENERAL ALLEGATIONS

6.      On or about January 22, 2014, Mr. Wu formed AEJ Associates, LLC ("AEJ"), a New Jersey limited liability company. At the suggestion of Cross-Defendant, his putative spouse, Mr. Wu installed Mr. Tsay, as Mr. Wu's nominee, as sole member of AEJ. Mr. Tsay was at all material times mentioned herein the sole legal owner of AEJ, while Mr. Wu was at all material times AEJ's equitable owner.

7.      On or about July 17, 2014, Mr. Tsay, at Mr. Wu's direction, opened two bank accounts in the name of AEJ at Wells Fargo Bank: (1) a business checking account (Acct. No. 347-XXXXXX5916-DDA)("AEJ Checking

AMENDED CROSS-CLAIM

Account") and (2) a business savings account (Acct. No. 347-XXXXXX1037-DDA)(the "AEJ Savings Account"). Mr. Tsay, Mr. Wu and Chia Jung Wu ("Ms. Wu") were from the opening of such accounts designated as the authorized signers for both the AEJ Checking Account and AEJ Savings Account.

8.      AEJ was formed as a holding company that conducted no business operations other than passively to own assets. AEJ's sole assets were the AEJ Checking Account, AEJ Savings Account, and a 5% interest in Manhattan Hotel Group, Co., Ltd. ("Manhattan"), consisting of 2,941,894 Taiwan shares of stock therein.

9.      In or about late February, 2015, Mr. Wu and Cross-Defendant orally agreed Cross-Defendant would purchase AEJ's shares in the stock of Manhattan in exchange for payment of NT$18.81 per share, for a total payment of NT$55,337,026. Based on the currency conversion rate on March 3, 2015, the agreed-upon purchase price represented approximately US$1,763,000. The parties' agreement was for the sale of AEJ's stock holdings in Manhattan only and did not include the AEJ Checking Account or the AEJ Savings Account. Because Cross-Defendant stated she wished to pay the purchase price partially in U.S. dollars in the United States and partially in Taiwan in New Taiwan Dollars, Mr. Wu and Cross-Defendant agreed their understanding would be set forth partially in an English language document (the "English Share Purchase Agreement") and partially in a Chinese language document (the "Chinese Share Purchase Agreement"). At the suggestion of Cross-Defendant, Cross-Defendant and Mr. Wu further agreed Cross-Defendant's attorney, Eudeen Chang ("Mr. Chang"), would prepare the English Share Purchase Agreement. Cross-Defendant informed Mr. Wu that Mr. Chang could not write in the Chinese language so that Mr. Wu and Cross-Defendant would have to prepare the Chinese Share Purchase Agreement themselves.

10.      On or about March 2, 2015, Cross-Defendant presented Mr. Wu with

AMENDED CROSS-CLAIM

the English Share Purchase Agreement she represented had been prepared by Mr. Chang. The following day, March 3, 2015, Mr. Tsay and Cross-Defendant executed the English Share Purchase Agreement. Mr. Wu, as AEJ's equitable owner, also executed the English Share Purchase Agreement as "Guarantor" of Mr. Tsay's performance thereunder. The same day, March 3, 2015, Mr. Wu and Cross-Defendant together prepared and executed the Chinese Share Purchase Agreement. At that time Cross-Defendant reduced the amount to be paid in New Taiwan Dollars to NT$22,197,303, thereby lowering the total purchase to $1,692,384 (the "Purchase Price"). Mr. Wu reluctantly accepted. A true and correct copy of the English Share Purchase Agreement is attached hereto and incorporated herein by this reference as Exhibit A. A true and correct copy of the Chinese Share Purchase Agreement is attached hereto and incorporated herein by this reference as Exhibit B. A true and correct copy of a certified English language translation of the Chinese Share Purchase Agreement is attached hereto and incorporated herein by this reference as Exhibit C.  The English Share Purchase Agreement, the Chinese Share Purchase Agreement, and the oral understandings between Mr. Wu and Cross-Defendant with respect thereto are hereinafter collectively referred to as the "Manhattan Shares Purchase Agreement."

11.     Mr. Wu, Ms. Tsay and Cross-Defendant entered into the Manhattan Shares Purchase Agreement with the mutual belief the sale was only for AEJ's shares in Manhattan and, hence, did not include any funds on deposit in the AEJ Checking Account or the AEJ Savings Account. Mr. Wu thus intends to file a cross-complaint against Cross-Defendant in the pending action *Lo. V. Wu*, *et al.*, Orange County Superior Court Case No. 30-2015-00800083-CU-CO-CJC for various claims, including breach of the Manhattan Shares Purchase Agreement. Further, if the Manhattan Shares Purchase Agreement is not enforced according to its terms as alleged herein, Mr. Wu in such action will seek reformation of the English Share Purchase Agreement and Chinese Share Purchase Agreement to

AMENDED CROSS-CLAIM

conform to the parties' understanding or, in the alternatively, rescission of the sale and restoration of AEJ's Manhattan stock to Mr. Wu and Mr. Tsay.

12.    Pursuant to the terms of the English Share Purchase Agreement, Cross-Defendant was required to pay Mr. Tsay $985,062 of the Purchase Price by way of three separate installments over the course of various days as set forth therein, beginning on March 3, 2015. The first installment due was in the amount of $300,000, the second installment due was in the amount of $484,000, and the third installment due was in the amount of $201,062.

13.    The remaining portion of the Purchase Price was to be paid by Cross-Defendant to Mr. Wu in New Taiwan Dollars by way of three installment payments over the course of various days in March 2015 pursuant to the terms of the Chinese Share Purchase Agreement.

14.    As of March 2, 2015, the AEJ Checking Account held a balance of $141,028.49. On or about March 3, 2015, Cross-Defendant, without informing Mr. Wu or Mr. Tsay, made the first installment payment of $300,000 due under the English Share Purchase Agreement into the AEJ Checking Account instead of directly to Mr. Tsay. Cross-Claimants are informed and believe and thereon allege that Wells Fargo Bank charged the AEJ Checking account a $15.00 transaction fee in connection with Cross-Defendant's first installment payment.

15.    On or about March 9, 2015, Mr. Wu and Mr. Tsay, after realizing what Cross-Defendant had done, withdrew Cross-Defendant's first installment payment of $300,000 from the AEJ Checking Account. Following that withdrawal, the AEJ Checking account held a balance of $141,013.49.

16.    On or about March 17, 2015, Cross-Defendant made the second installment payment of $483,982 due under the English Share Purchase Agreement into the AEJ Checking Account instead of directly to Mr. Tsay. Cross-Claimants are informed and believe and thereon allege that Wells Fargo Bank charged the AEJ Checking account a $16.00 transaction fee in connection with Cross-

AMENDED CROSS-CLAIM

1   Defendant's second installment payment. Shortly thereafter, Mr. Wu, Mr. Tsay and

2   Ms. Wu withdrew $270,000 of the second installment payment of $483,982 from

3   the AEJ Checking Account. After such withdrawal, the AEJ Checking Account

4   held a balance of $354,979.49, of which $213,982 represented the remaining

5   portion of Cross-Defendant's second installment payment under the English Share

6   Purchase Agreement and $140,997.49 represented the AEJ Checking Account

7   balance.

8       17.    As of March 19, 2015, Cross-Defendant had only payed Mr. Wu the

9   first and second installment payments as required of her pursuant to the Chinese

10  Share Purchase Agreement. Cross-Claimants thereon allege that as of March 20,

11  2015, Cross-Defendant had failed to make all of the payments required of her

12  under the Manhattan Shares Purchase Agreement.

13      18.    On or about March 20, 2015, Cross-Defendant's attorney, Mr. Chang,

14  sent an email followed by a confirming letter on behalf of Cross-Defendant to

15  Cross-Claimants advising them that because AEJ was now owned by other parties,

16  to close all bank accounts in AEJ's name and transfer the assets in the AEJ

17  Checking Account to another account.

18      19.    Cross-Claimants are informed and believe, and thereon allege, that on

19  or about March 20, 2015, before Cross-Claimants had the opportunity to transfer

20  their assets in the AEJ Checking Account and AEJ Savings Account to another

21  account as advised by Mr. Chang, Cross-Defendant falsely represented to Wells

22  Fargo Bank that she was the sole owner of the AEJ Checking Account and AEJ

23  Savings Account, presenting the English Share Purchase Agreement as supposed

24  proof thereof. At said time, Cross-Defendant was aware that her agreement with

25  Mr. Wu and Mr. Tsay was for only for the sale of AEJ's shares in Manhattan and

26  did not include the AEJ Checking Account or the AEJ Savings Account. Cross-

27  Claimants are further informed and believe and thereon allege that Cross-

28  Defendant nonetheless instructed Wells Fargo Bank to close the existing AEJ

AMENDED CROSS-CLAIM

Checking Account and AEJ Savings Account, to open a "new" AEJ checking account, designating herself as sole signatory, and to transfer the remaining balance of $354,979.49 from the AEJ Checking Account and the balance of $29,700.10 from the AEJ Savings Account to the "new" AEJ checking account.

20.     On or about March 24, 2015, Mr. Wu, Mr. Tsay, and Ms. Wu discovered that the AEJ Checking Account had been closed and its funds withdrawn without their consent. Accordingly, Ms. Wu submitted an Affidavit of Check Fraud report to Wells Fargo Bank for a claim in the amount of $354,979.49. A copy of the Affidavit of Check Fraud is attached hereto as Exhibit D.

21.     Thereafter, the Wells Fargo Claims Department notified Mr. Wu, Mr. Tsay, and Ms. Wu that the $354,979.49 had been transferred to a "new" AEJ checking account in Newport Beach, California. Cross-Claimants are informed and believe and thereon allege that Wells Fargo Bank froze the sum of $354,979.49 following its receipt of the Affidavit of Check Fraud report.

## FIRST CLAIM FOR RELIEF

### (For Conversion Against Cross-Defendant)

22.     Cross-Claimants hereby incorporate by reference the allegations in paragraphs 1 through 21, hereinabove, as if set out in full herein.

23.     Cross-Claimants are, and at all times herein mentioned were, the rightful owners of the $354,979.49 remaining in the AEJ Checking Account, of which $213,982 represented the remaining amount of Cross-Defendant's second installment payment under the English Share Purchase Agreement and $140,997.49 represented the AEJ Checking Account cash balance.

24.     Without legal authority or right, Cross-Defendant intentionally and substantially interfered with the $354,979.49 by closing the AEJ Checking Account and transferring the $354,979.49 to a "new" AEJ checking account to which she alone had access.

25.     Cross-Claimants did not consent to Cross-Defendant's actions.

26.     Cross-Claimants are informed and believe, and based thereon allege, that the total amount converted by Cross-Defendant exceeds $354,979.49. No portion of the converted funds has been returned to Cross-Claimants.

27.     As a direct and proximate result of such conversion, Cross-Claimants have been damaged in an amount exceeding $354,979.49.

28.     The aforementioned acts of Cross-Defendant were willful, malicious, and oppressive, were undertaken with the intent to defraud, and justify an award of punitive damages to Cross-Claimants in a sum sufficient to punish Cross-Defendant and deter similar misconduct in the future.

**SECOND CLAIM FOR RELIEF**

**(For Declaratory Relief Against Cross-Defendant)**

29.     Cross-Claimants hereby incorporate by reference the allegations in paragraphs 1 through 28, hereinabove, as if set out in full herein.

30.     An actual controversy has arisen and now exists between Cross-Claimants and Cross-Defendant. The dispute pertains to the $354,979.49 that Cross-Defendant caused to be transferred to the "new" AEJ account, which funds Wells Fargo Bank has interplead. On the one hand, Cross-Claimants contend the interplead funds belong to Mr. Wu and Mr. Tsay. On the other hand, Cross-Defendant contends the interplead funds belong to her.

31.     Cross-Claimants desire a judicial determination of their rights and duties with regard to the interplead funds.

32.     A judicial declaration is necessary and appropriate at this time under the circumstances so that Cross-Claimants may ascertain their rights and duties with respect to the interplead funds.

WHEREFORE, Cross- Claimants pray for judgment against Cross-Defendant as follows:

**ON THE FIRST CLAIM FOR RELIEF**:

1.     For the value of the property converted in an amount, according to

8

proof, of no less than $354,979.49;

2.    For punitive damages in an amount appropriate to punish Cross-Defendant and deter others from engaging in similar conduct;

**ON THE SECOND CLAIM FOR RELIEF**:

3.    For a judicial determination of Cross-Claimants' rights to the interplead funds in the amount of $354,979.49;

**ON ALL CLAIMS FOR RELIEF**:

4.    For prejudgment interest thereon at the legal rate;

5.    For attorneys' fees incurred herein, as and to the extent permitted by law;

6.    For costs of suit incurred herein; and,

7.    For such other and further relief as the Court may deem just and proper.

Dated:  April 18, 2016           KIBRE & HORWITZ LLP

By: _____*/s/Selina Hartonians*_____
SELINA HARTONIANS
Attorneys for Cross-Claimants TING-TAR WU and ALEXANDER TSAY

I:\DOCS\W1637\002\FEDERAL\L006 Amended Cross-claim rev 4.docx

AMENDED CROSS-CLAIM

**EXHIBIT A**

## SHARE PURCHASE AGREEMENT

THIS SHARE PURCHASE AGREEMENT (the "**Agreement**") is made and entered into as of March 2, 2015, by and between Alexander Tsay ("**Seller**"), Lihui Lo ("**Buyer**"), and Steven Ting-Tar Wu ("**Guarantor**").

### RECITALS

A.      Seller is the holder of 100% shares (the "**Shares**") of AEJ Associates LLC, a New Jersey Limited Liability corporation (the "**Company**"). The Company is a direct and/or beneficial owner of _2941894__ Taiwan shares _= 985062 US shares is  of Manhattan Hotel Group, Co., Ltd., an exempted company incorporated under the laws of the Cayman Islands ("**Manhattan**") that is in the process of an initial public offering on the Taiwan Stock Exchange. The us shares is  shares of Manhattan owed by the Company shall be referred to as "**Manhattan Shares**".

B.      Seller desires to sell to Buyer and Buyer desires to purchaser from Seller all of the Shares on the terms and conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **AGREEMENT TO PURCHASE AND SELL COMPANY AND SHARES.** Buyer agrees to purchase the Shares from Seller and Seller agrees to sell the Shares to Buyer for an aggregate purchase price of $985,062.00. In connection with this Agreement, Seller shall take all actions necessary to cause the Company to deliver to Buyer one or more certificates representing the ownership of Buyer of the Shares in the Company and/or the Manhattan Shares (including, without limitation, the execution of any documents required by the Taiwan Stock Exchange in connection with the transfer of the Manhattan Shares). $300,000.00 of the foregoing sum of $985,062.00 shall paid by the Buyer to Seller within 3 business days of Seller's delivery to Buyer of a fully executed Agreement. Another $484,000.00 of the foregoing sum of $985,062.00 shall be paid by the Buyer to Seller within 7 business days of when Buyer revises the Company's operating agreement and article of incorporation to reflect this Agreement, files an amended certificate of formation reflecting this Agreement, and receives pertinent Federal and/or New Jersey governmental approval for the same, if necessary. The seller and buyer need transfer state article and statement , minutes in 3 months . The remaining $ 201,062.00 of the $985,062.00 sum shall be delivered to Seller within 7 business days after approval of pertinent Taiwan Stock Exchange authorities of the transfer of the Manhattan shares owed by the Company to Buyer. Buyer has absolute right to cancel this Agreement for any reason, including but not limited, the non-approval of the Shares transfer by pertinent Federal and/or New Jersey governing entities, or the non-approval of Manhattan shares transfer by pertinent Taiwan Stock Exchange authorities.

2.      **FURTHER ASSURANCES.** At any time and from time to time after the date of this Agreement, and for no additional consideration, Seller shall execute and deliver to Buyer such other instruments and take such other action as Buyer may reasonably request to vest title to the Shares or Manhattan Shares more effectively in Buyer. In addition, the Parties

agree to restructure the transactions contemplated by this Purchase Agreement as may be necessary to mitigate the effect of taxes.

3.  **REPRESENTATIONS AND WARRANTIES OF SELLER.** The Company and Seller each represents and warrants to Buyer as follows:

   3.1.   Authorization. No action, consent, order, approval or authorization of any person or entity, other than the consent of the Company, is necessary or required in order to permit Seller to execute, deliver and perform this Agreement.

   3.2.   Binding Agreement. This Agreement is the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the terms of this Agreement.

   3.3.   No Conflicts. The execution, delivery and performance by Seller of this Agreement and compliance by Seller with this Agreement have not resulted (and will not result) in any violation of, or be in conflict with, or invalidate, cancel or make inoperative, accelerate an obligation or result in the imposition of a lien or encumbrance under, interfere with, or constitute a default (whether with notice or lapse of time or both) under any law, charter, bylaw, partnership agreement, trust agreement, contract, indenture, mortgage, deed of trust, loan, permit, other agreement or instrument, judgment, decree or order to which Seller is a party or by which Seller is bound, or to which the Company is a party or by which the Company is bound.

   3.4. Ownership. Seller is the lawful owner, of record and beneficially, of the Shares and has good and marketable title to such Shares, free and clear of any liens, claims or encumbrances.   Company is the lawful owner, of record and beneficially, of the Manhattan Shares and has good and marketable title to such shares, free and clear of any liens, claims or encumbrances.

   3.5. No Prior Transfers. Neither Company or Seller has not previously assigned (collaterally or otherwise), sold, conveyed, transferred, encumbered, subjected to a security interest or hypothecated or purported or agreed to assign (collaterally or otherwise), sell, convey, transfer, encumber, subject to a security interest or hypothecate, all or any portion of any right, title or interest in the Shares.   Neither Company or Seller has not previously assigned (collaterally or otherwise), sold, conveyed, transferred, encumbered, subjected to a security interest or hypothecated or purported or agreed to assign (collaterally or otherwise), sell, convey, transfer, encumber, subject to a security interest or hypothecate, all or any portion of any right, title or interest in the Manhattan Shares.

   3.6.   No Debt. The Company has no outstanding debt, liability, or obligations to third parties.

   3.7.   No Pending Litigation. There are no actions, suits, arbitrations, claims or proceedings or investigations pending or, to the best knowledge of Seller, threatened (nor any basis therefor) against Seller or the Company which question or which would question, directly or indirectly, the validity or enforceability of this Agreement or which would have a material adverse effect on the business or assets of the Company, including the Manhattan Shares. To the best knowledge of Seller, there are no orders, judgments or decrees of any Federal, state or other court or governmental authority or agency against the Company which could have a material adverse effect on the business or assets of the Company, including the Manhattan Shares.

2

3.8.   Bankruptcy.  There are no attachments, levies, executions, assignments for the benefit of creditors, receiverships, conservatorships or voluntary or involuntary proceedings in bankruptcy or pursuant to any other debtor relief laws contemplated by or pending against Seller.

3.9.   Other Matters Relating to Shares and Manhattan Shares.  The Shares are validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership of such Shares.  There are no warrants, options or agreements with respect to any class of capital stock of the Company, including, without limitation, agreements granting to any person rights to acquire any capital stock in the Company or agreements with respect to the voting of such capital stock.  The Manhattan Shares are validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership of such Manhattan Shares.  There are no warrants, options or agreements with respect to the Manhattan Shares including, without limitation, agreements granting to any person rights to acquire the Manhattan Shares or agreements with respect to the voting of the Manhattan Shares.

3.1.   No Prior Transfers of Shares and Manhattan Shares.  Neither Company or Seller has not previously assigned (collaterally or otherwise), sold, conveyed, transferred, encumbered, subjected to a security interest or hypothecated or purported or agreed to assign (collaterally or otherwise), sell, convey, transfer, encumber, subject to a security interest or hypothecate, all or any portion of any right, title or interest in the Shares. Neither Company or Seller has not granted any right of refusal or other preferential right to purchase the Shares or any portion of the Shares to any other person or entity.  Neither Company or Seller has not previously assigned (collaterally or otherwise), sold, conveyed, transferred, encumbered, subjected to a security interest or hypothecated or purported or agreed to assign (collaterally or otherwise), sell, convey, transfer, encumber, subject to a security interest or hypothecate, all or any portion of any right, title or interest in the Manhattan Shares.  Neither Company or Seller has not granted any right of refusal or other preferential right to purchase the Manhattan Shares or any portion of the Manhattan Shares to any other person or entity.

4.   **REPRESENTATIONS AND WARRANTIES OF BUYER.**   Buyer represents and warrants to Seller as follows:

4.1.   Binding Agreement.  This Agreement is the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the terms of this Agreement.

4.2.   No Conflicts.  The execution, delivery and performance by Buyer of this Agreement and compliance by Buyer with this Agreement have not resulted (and will not result) in any violation of, or be in conflict with, or invalidate, cancel or make inoperative, accelerate an obligation or result in the imposition of a lien or encumbrance under, interfere with, or constitute a default (whether with notice or lapse of time or both) under any law, charter, bylaw, partnership agreement, trust agreement, contract, indenture, mortgage, deed of trust, loan, permit, other agreement or instrument, judgment, decree or order to which Buyer is a party or by which Buyer is bound.

4.3.   No Pending Litigation.  There are no actions, suits, arbitrations, claims or proceedings or investigations pending or, to the best knowledge of Buyer, threatened (nor any basis therefor) against Buyer which question or which would question, directly or indirectly, the validity or enforceability of this Agreement.

4.4.   <u>Bankruptcy</u>.  There are no attachments, levies, executions, assignments for the benefit of creditors, receiverships, conservatorships or voluntary or involuntary proceedings in bankruptcy or pursuant to any other debtor relief laws contemplated by or pending against Buyer.

4.5.   <u>Due Diligence</u>.  Buyer has been afforded access to the books, financial statements, records, contracts, documents and other information concerning the Company and the business and assets of the Company as Buyer has deemed necessary or advisable in evaluating the sufficiency of the Purchase Price under this Agreement.  Buyer has been afforded an opportunity to ask such questions as Buyer has deemed necessary or desirable in order to evaluate the merits and risks of the transactions contemplated by this Agreement and is fully satisfied with the answers received.  Buyer has performed his own due diligence with respect to this Agreement and is relying on that due diligence in entering into this Agreement and, except as specifically provided in this Agreement, is not relying on Seller, the Company, or the officers, directors, employees or affiliates of Company with respect to tax or other economic considerations.  The Purchase Price and all other terms of this Agreement were arrived at through arm's-length negotiations and represent full and fair consideration for the Shares.

5.   **SURVIVAL OF REPRESENTATIONS AND WARRANTIES.**  The representations and warranties made by the parties under this Agreement shall survive the Closing, without regard to any investigation made by the other parties, and shall be fully enforceable at law or in equity against the warranting party and against the successors and assigns of such warranting party.

6.   **INDEMNITY AND GUARANTY.**  Each party agrees to indemnify, hold harmless, and defend the other party from any and all liabilities, judgments, claims, costs and expenses arising out of or in any way connected with the breach of any of the representations, warranties, covenants or agreements of such party set forth in this Agreement.  Guarantor shall be personally liable for any breach of the any of the representations, warranties, covenants or agreements of Seller set forth in this Agreement.  Guarantor also absolutely and unconditionally guaranties Seller's return of any money paid by Buyer pursuant to paragraph 1 in the event Buyer cancels this Agreement (should Seller fail to return any money paid by Buyer, Buyer can look to Guarantor for repayment of the same).

7.   **MISCELLANEOUS.**

7.1.   <u>Notices</u>.  All notices, requests and other communications provided for in this Agreement shall be in writing, unless otherwise specified in this Agreement, and shall be delivered personally to Seller or Buyer, by air courier, by facsimile (with receipt confirmed) or by first-class mail, postage prepaid, at the address set forth below:

Seller

_Alexander Tsay_            _alexander.tsay@gmail.com_

Buyer

_Lo, Li HUI_            _Lo-kitty @ hotmail.com_

Guarantor            _Tingtaiwu @ahr.com_

7.2.  <u>Amendment and Waiver</u>.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of both parties.

7.3.  <u>Gender</u>.  The parties agree that any use of words in any gender in this Agreement shall also refer to the masculine, feminine or neuter gender, as the case may require.

7.4.  <u>Titles and Captions</u>.  The parties agree that this Agreement contains Section, Paragraph or subparagraph titles or captions only as a matter of convenience to facilitate references in this Agreement and that the use of these titles and captions shall in no way limit, explain, define, amend, supplement or extend the text and the provisions of any Section, Paragraph or subparagraph of this Agreement.

7.5.  <u>No Waivers</u>.  A failure by any party to insist on the strict performance of any covenant or duty required by this Agreement or to pursue any remedy under this Agreement shall not constitute an express or implied consent or waiver of the breach of the remedy.  No breach of any provision of this Agreement can be waived unless in writing.  A waiver by any party of a breach of any of the provisions of this Agreement to be performed by the other party shall not be construed as a waiver of any succeeding breach of the same or any other provision.

7.6.  <u>Governing Law</u>.  The parties agree that the laws of the State of California, as such laws are applied to agreements between California residents entered into and performed entirely in California, govern this Agreement and all questions with respect to this Agreement, the interpretation of this Agreement and the rights and liabilities of the parties.

7.7.  <u>Severance of Unenforceable Terms</u>.  If any provision of this Agreement or the application of such provision to any party or circumstances shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been part of this Agreement.  Furthermore, in lieu of each such illegal, invalid or unenforceable provision, there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

7.8.  <u>Successors and Assigns</u>.  Except as otherwise expressly provided in this Agreement, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties to this Agreement and shall inure to the benefit of and be enforceable by each person who shall be a holder of the Shares from time to time.

7.9.  <u>Counterparts</u>.  The parties may execute this Agreement in any number of counterparts and, as so executed, the counterparts shall constitute one and the same Agreement.  The parties agree that each such counterpart is an original and shall be binding upon all of the parties, even though all of the parties are not signatories to the same counterpart.

OC 7475880v1

7.10.   Merger Of Prior Agreements And Understandings.   This Agreement contains the entire understanding among the parties, supersedes any prior or contemporaneous written or oral agreements, understandings and representations between such parties respecting the subject matter contained in this Agreement, and merges all prior negotiations concerning such subject matter into this Agreement.   The parties agree that there are no representations, agreements, arrangements or understandings, oral or written, between the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement as of the date set forth above.

"SELLER"

Alexander Tsay

"BUYER"

Lihui Lo

"GUARANTOR"

Ting-Tar (Steven) Wu

Acknowledged and accepted as to
the representations and warranties:

AEJ Associates LLC,
a New Jersey Limited Liability Company

By:
Print Name: Alexander Tsay
Title: President

Jane H. Agosto  3/3/15
Jane H Agosto
Notary Public
New Jersey
My Commission Expires 8-6-18
No. 2216539

OC 7475880v1

**Name of Company**  Manhattan Hotel Group Co., Ltd.

Company Number  BS-276647

**REGISTER OF MEMBERS**

| Full Name | LV HOTEL GROUP LLC | | | | | Occupation | Corporation | | | | | | Date Entered as a Member | | | 30-Apr-14 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Address | 3159 US Highway 46, Parsippany, NJ 07054, USA | | | | | | | | | | | | Date of Ceasing to be Member | | | | |
| | | Share Acquired | | | | | | Share Transferred | | | | | | | | | |
| Date | Certificate Number | Distinctive Nos. | | No. of Shares | Consideration Paid | No. of Transfer Deed | Certificate Number | Distinctive Nos. | | No. of Shares | Consideration Paid | Total Shares Held | Remarks | Entry Made By |
| | | From | To | | | | | From | To | | | | | |
| 18-Sep-14 | 69 | 53,722,626 | 54,170,525 | 447,900 | NTD4,479,000 | | | | | | | 4,725,862 | Alotment | |
| 18-Oct-14 | 95 | 25,131,554 | 25,430,153 | 298,600 | NTD5,972,000 | . | | | | | | 5,024,462 | Transferred from J Vest LLC | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

| Full Name | AEJ Associates LLC | | | | | Occupation | Corporation | | | | | | Date Entered as a Member | | | 30-Apr-14 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Address | 1 BacCArat Ct. Ste 2a, Montville, NJ 07045, USA | | | | | | | | | | | | Date of Ceasing to be Member | | | | |
| | | Share Acquired | | | | | | Share Transferred | | | | | | | | | |
| Date | Certificate Number | Distinctive Nos. | | No. of Shares | Consideration Paid | No. of Transfer Deed | Certificate Number | Distinctive Nos. | | No. of Shares | Consideration Paid | Total Shares Held | Remarks | Entry Made By |
| | | From | To | | | | | From | To | | | | | |
| 1-Oct-14 | 87 | 17,204,326 | 20,146,219 | 2,941,894 | | | | | | | | 2,941,894 | Reissued for remain shares after share transfer | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

| Page No. | 3-1 | Class of Share | ORD | Par Value Per Share | NTD10 | PLEASE NOTE: THE ORIGINAL OR COPY OF THIS REGISTER MUST BE KEPT AT THE REGISTERED OFFICE. | CAYMAN |
|---|---|---|---|---|---|---|---|

**EXHIBIT B**

## 台幣匯款承諾書

我, 羅麗惠承諾依照 3/3/2015 AEJ 股權轉讓契約付款程序,
同時分三次以台幣匯款存入吳定達的台灣郵局賬戶:

(1) 於 3/6/2015 前存入台幣 $6,760,173.

(2) 於美國股權轉讓生效日7天內存入台幣 $10,906,417.

(3) 於台証期會批准轉讓生效日7天內存入台幣 $4,530,713.
   (第三筆款 以美元兑台幣 31.58 計. 但以真正交割日另追
   少補此匯率)

羅麗惠 3/3/2015          吳定達 3/3/2015

| NTD | pay in US USD | | USD | pay in Taiwan NTD | |
|---|---|---|---|---|---|
| 9,474,000 = | 300,000 | + | 214,065 | = | 6,760,173 |
| 15,284,720 = | 484,000 | + | 345,358 | = | 10,906,417 |
| 6,349,537 = | 201,062 | + | 143,468 | = | 4,530,713 |
| 31,108,257 | $985,062 | + | 702,891 | | 22,197,303 |

$$= 941894 \times 18.2 倍 = 535个470$$
$$= 23697.5$$

$$951062$$

$$\frac{985,062}{+ \ 702,891} \times 31.58 = NT \ 33,0.55485$$
$$US 1,687,953$$

3/3 匯率
USD vs. NTD
3/3/2015 Exchange Rate

**EXHIBIT C**

# USA SERVICE AFFAIRS
## Legal & Taxation
### USA 移民法律稅務事务所
19095 COLIMA ROAD, ROWLAND HTS. CA 91748
Tel: 626-854-2877  Fax: 626-965-8838

# AFFIDAVIT
# （公　證　書）

Authenticated true and correct English translation of Chinese
document attached hereto.



_____
Notary Public

Date: 09/02/2015

JIH CHYI LEU
COMM. #2003135
Notary Public-California
LOS ANGELES COUNTY
My Comm. Exp. JAN. 5, 2017

## New Taiwan Dollars Wiring Commitment Agreement

I, Lo, Lihui (aka Kitty) promises to follow the payment schedule of AEJ stock equity transfer agreement, dated March 3, 2015, simultaneously to make 3 payments and wired by New Taiwan Dollars to Wu, Tingtar (aka Steven) account in Taiwan Postal Office:

(1) To deposit NT $6,760,173 before March 13, 2015

(2) To deposit NT $ 10,906,417 within 7 days after U.S. stock equity transfer becomes effective.

(3) To deposit NT $ 4,530,713 within 7 days after Taiwan Securities & Futures Bureau approves said stock equity transfer.

( The 3rd payment's currency exchange rate is $1 USD to NTD $31.58. The actual currency exchange rate will be based on the date of wiring.)

Date:    3/3/2015

/S/_____          /S/ _____
      Lo, Lihui                              Wu, Tingtar



**EXHIBIT D**



**Affidavit of Check Fraud**

**WELLS FARGO**

| NAME OF CLAIMANT | WELLS FARGO ACCOUNT NUMBER | DATE |
|---|---|---|
| AEJ ASSOCIATES LLC | 347-1189375916-DDA | 03/24/2015 |

| ☐ Signature Forged | ☐ Endorsement Forged | ☐ Counterfeit | ☐ Altered | ☐ Unauthorized Draft | ☐ Other |
|---|---|---|---|---|---|
| My signature on the face of the check(s) listed below is a forgery. I did not sign the check(s) and I did not authorize the signature. | My endorsement on the reverse of the check(s) listed below is a forgery, missing, or otherwise incorrectly endorsed. I did not sign the check(s) and/or I did not authorize the signature(s). | The check(s) are an imitation of checks drawn on my account. I did not create, sign, or authorize the creation or signatures of the checks listed below. | The check(s) listed below have unauthorized alterations. I did not alter the payee or the amount, nor have I directly or indirectly authorized anyone to make alterations to the check(s). | I did not authorize or otherwise approve the creation or payment of this item. | Please Explain |

### Please include the following information for each fraudulent check:

- If the check was altered, please use two lines and include the 'as written' check information, as well as the 'as paid' information.
- If you are claiming more than 1 check as "Endorsement Forged", please make photo copies of this form and submit each check with a separate signed affidavit page.
- If you have more than 4 checks to list (except Endorsement Forged), please use page 2 of this affidavit or attach a separate sheet.

| Check # | Date | Amount | Made payable to |
|---|---|---|---|
| 1212 | 03/20/2015 | $354,979.49 | I don't know |
| Check # | Date | Amount | Made payable to |
| | | | |
| Check # | Date | Amount | Made payable to |
| | | | |
| Check # | Date | Amount | Made payable to |
| | | | |

Check here if you have included additional items on an attached sheet or on the back of form: ☐

### BY SIGNING BELOW, YOU ARE MAKING THE FOLLOWING DECLARATIONS:

| CLAIM TOTAL: |
|---|
| $354,979.49 |

- I did not receive any benefit or value from the proceeds of the check(s) listed above.
- I have not arranged with the person(s) who misused the check(s) listed above to be reimbursed for any portion of the proceeds of the check(s).
- I will cooperate in any investigation, promptly disclose any information requested by the bank, and if necessary, cooperate fully with any prosecution.
- I will testify to the truth of these statements in any case which may result from this affidavit.
- All information I have provided in this document is true.

*I DECLARE UNDER THE PENALTY OF PERJURY THAT THE ABOVE STATED IS TRUE.*

| Signature of Claimant (If a Business account, include your Title) | Date |
|---|---|
| Chi-J-Wu. member of LLC | 03/25/2015 |
| Address of Claimant | Phone Number |
| 2000 Fashion Show Dr. unit 3706, Las Vegas NV 8906 | (973) 652-1199 |



Place Notary Stamp Here

**OFFICIAL SEAL**
**Nabila Walli**
NOTARY PUBLIC - STATE OF NEW MEXICO
My Commission Expires: 09/26/17

**PAYEE/ENDORSER SIGNATURE   (FORGED ENDORSEMENT CLAIMS ONLY)**

| Signature of Payee/Endorser (If a Business account, include your Title) | Date |
|---|---|
| | |

### NOTARY INFORMATION

State of: New Mexico   County of: Bernalillo

Subscribed and sworn before me this 25th day of March year 2015

My commission Expires 09/26/17

Signature of Notary Public: Nabila Walli

*DID2015-03-24=061224,227000*
2015032300959 (BANK USE ONLY)



Wells Fargo Bank
Liability Fraud and Claims Mgt
Check Fraud Claims MAC D4003-012
201 W. 4th Street
Winston-Salem, NC 27101

03/24/2015

AEJ ASSOCIATES LLC
34 VIA RUBINO
NEWPORT COAST, CA 92657-1607

Subject: Document needed to resolve fraud claim.
Claim #: 2015032300959

Dear AEJ ASSOCIATES LLC:

Thank you for contacting us on 03/23/2015 about the fraudulent check(s) on your account. To help us resolve your claim, please complete and return the enclosed affidavit within 20 days from the date of this letter.

Please take the following actions:

1. Complete and sign the enclosed Affidavit of Check Fraud.

2. Provide the police report number and the suspect's name on the affidavit.

3. Return your completed document in the envelope provided or bring it to your local Wells Fargo store.

If you have any questions, please contact us at 1-877-548-9230 Monday through Friday between 7:00 a.m. and 6:00 p.m. or on Saturday between 7:00 a.m. to 3:00 p.m. Pacific Time.

Thank you.

Laura Epstein - Financial Crimes Manager
Claims Assistance Center
Enclosure



**Questionnaire of Check Fraud**

5) Do you know who might have committed the fraud?
(If yes, please list their name and relationship to you here)

Wells Fargo employee.

6) Please give details about this person including addresses and phone numbers. If a current or former employee, list employment dates.

the person who closed our account

7) Explain how the person that committed the fraud might have gained access to your account information.

He is Wells Fargo's employee.

8) Please tell us anything else that might help us with the investigation.

N/A

*I DECLARE UNDER THE PENALTY OF PERJURY THAT THE ABOVE STATED IS TRUE.*

| Signature of Claimant (If a Business account, include your Title) | Date |
|---|---|
| Chi-Jy Wu, member of LLC | 03/25/2015 |
| Address of Claimant | Phone Number |
| 2000 Fashion Show Dr, unit 3706, Las Vegas, NV 89128 | (973)652-1199 |



[CLMDP00d0xxxxdxd0xxd0d0]



**Questionnaire of Check Fraud**

Please answer the following questions to assist us in our investigation:

**1) When and how did you discover the fraud in your account?**

Received the email from Wells Fargo on 03/21/2015 regarding Wells Fargo have updated our contact information.

Also we lost the on line banking ability to access our account. We believe only Wells Fargo official can close our on line access ability.

**2) When and how did you report the fraud to Wells Fargo?**

On 03/22/2015, my brother Steven Wu called Wells Fargo hot line 1-800-225-5935, spoke to Teishka (reference # XQR08/2/04202), she mention that there is a Wells Fargo employee Scott Cheo closed our account without the autherization from any of our 3 authorized signers.

**3) Have you reported the fraud to law enforcement? If yes, please provide the agency, investigator name (if assigned), and the case number.**

not yet.

**4) What is your Drivers License number and State of issue and expiration date?**

NV 1604934348   10/28/2022

